UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 09-11649-RWZ

JOSEPH M. RAMOS, SR.,
*as Administrator of the Estate of Joseph M. Ramos, Jr.*

v.

JARED WHITE, *et al.*

MEMORANDUM OF DECISION

November 2, 2012

ZOBEL, D.J.

On August 11, 2009, police officers Scott Brooks ("Brooks") and Jared White ("White") of the Town of Dartmouth, Massachusetts, encountered Joseph M. Ramos, Jr. ("Ramos"). The parties dispute what happened at that encounter, but agree that White shot and killed Ramos. Ramos's father brings this action as the administrator of Ramos's estate, raising claims under 42 U.S.C. § 1983 and the Massachusetts Civil Rights Act ("MCRA"), Mass. Gen. Laws ch. 12, §11I, against Brooks, White, and the Town of Dartmouth. Defendants have moved for summary judgment.

I.      **Background**

On the evening in question, Brooks and White were dispatched to Milton Street in Dartmouth to respond to a neighborhood report of a man walking in and out of people's yards. Brooks arrived first, and observed Ramos walking on Milton Street,

carrying a four-foot stick with nails sticking out of one end. White arrived about thirty seconds later in his canine patrol vehicle, accompanied by a police dog.

Brooks came up to Ramos and began speaking with him face-to-face, while White approached Ramos from behind. Brooks noticed that Ramos appeared confused and was sweating profusely. He instructed Ramos to drop the stick, which Ramos did. He then began asking Ramos who he was and what was going on; Ramos told him that he was "using the stick to get some rabid snakes and skunks out of his place." Docket # 25, Ex. E at 62. Based on certain witnesses' depositions, Ramos characterizes Brooks's demeanor as aggressive. Brooks testified that he asked Ramos if Ramos needed medical assistance, and Ramos said no; witnesses for Ramos have testified that Ramos asked to be taken to a hospital.

Ramos, becoming nervous, put his hands in his pockets. Brooks ordered him to take his hands out of his pockets; Ramos began to comply, but not quickly enough for Brooks. Brooks moved towards Ramos and reached to grab his right hand, to prevent him from taking any potential weapon out of his pocket.

At this point, the parties' accounts diverge. According to witnesses for Ramos, as Ramos withdrew his hands from his pockets, Brooks grabbed his right hand, and a small screwdriver that had been in Ramos's pocket flew out and fell to the ground. Ramos then shoved Brooks, and he and Brooks fell down together. At about that time, White released his police dog. Brooks shoved Ramos while on the ground, scrambled up, and drew his weapon; meanwhile, Ramos tried to stand up but could not do so because of a longstanding illness that caused permanent weakness in his feet and

lower legs. While Ramos was attempting to stand up, White shot him.

According to Brooks and White, as Brooks moved towards Ramos, Ramos drew a screwdriver from his pocket and attacked him. Brooks fell onto his back, and Ramos remained over him stabbing at him with the screwdriver while Brooks tried to push him away with his feet. Both Brooks and White repeatedly yelled at Ramos to drop his weapon. Seeing the struggle from behind, White believed Ramos was lethally stabbing Brooks in the head and neck. He released his police dog, but the dog failed to stop the struggle and White recalled him. Ramos then turned toward White and lunged at him; White attempted to step back, ordered Ramos once more to drop his weapon, and finally shot Ramos.

## II.     Legal Standard

Summary judgment will be granted if there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). The court must view the record in the light most favorable to the non-moving party and draw all justifiable inferences in that party's favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

## III.    Analysis

Defendants move for summary judgment on all four counts of the complaint. I will address each count individually.

### A. Count I

In Count I, Ramos sues Brooks and White under 42 U.S.C. § 1983, claiming that each officer violated his Fourth Amendment rights by subjecting him to excessive force.

3

The level of force used was "excessive," violating the Fourth Amendment, only if the officers used more force than was objectively reasonable. Graham v. Connor, 490 U.S. 386, 397 (1989). The reasonableness inquiry balances the intrusion on the individual's Fourth Amendment interests against the countervailing government interests, keeping in mind that "police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." Id.

### 1. Brooks

As regards Brooks, Ramos claims that Brooks subjected him to excessive force by grabbing his right hand, by shoving him while they were both on the ground, and by drawing his weapon after scrambling to his feet. But even taking all the facts in the light most favorable to Ramos, the level of force Brooks applied was objectively reasonable. At the time Brooks grabbed Ramos's hand, he had already noticed that Ramos appeared confused, was sweating profusely, and was responding slowly to the order to remove his hands from his pockets. Given that Ramos might have been concealing a weapon in his pocket, it was objectively reasonable for Brooks to grab Ramos's hand to protect his own safety. See Terry v. Ohio, 392 U.S. 1, 27 (1968) (objectively reasonable for an officer to stop and frisk a suspect given reasonable suspicion of danger to himself or others); see also Graham, 490 U.S. at 396 (right to stop and frisk "necessarily carries with it the right to use some degree of physical coercion"). Likewise, after Ramos and Brooks grappled and fell to the ground, it was objectively reasonable for Brooks to shove Ramos in order to disengage him and scramble up

more quickly. There is no evidence that the level of force used in either the grab or the shove was more than de minimis. Finally, even assuming that Brooks exerted force against Ramos by pointing his weapon at him, that force would be objectively reasonable given that he and Ramos had been grappling on the ground moments before and that there was a dangerous weapon—a four-foot stick with embedded nails—in the vicinity. Cf. Flowers v. Fiore, 359 F.3d 24, 34 (1st Cir. 2004) (officers acted reasonably in displaying weapons at traffic stop given report that suspect might be armed and given their "limited purpose of protecting themselves and securing [the suspect] safely"). Because the level of force employed by Brooks was objectively reasonable, even on Ramos's view of the facts, Brooks did not violate Ramos's Fourth Amendment rights.

In his complaint, Ramos alleges that Brooks and White acted "in concert" to violate his Fourth Amendment rights. To the extent this alleges that Brooks conspired with White (and so could be liable for White's use of force), Brooks is entitled to summary judgment because Ramos has produced no facts showing such conspiracy. See Estate of Bennett v. Wainwright, 548 F.3d 155, 178 (1st Cir. 2008).

Therefore, Brooks is entitled to summary judgment on Ramos's § 1983 claim against him.[1]

### 2. White

White, however, is not entitled to summary judgment. On Ramos's version of the

---

[1] Because Brooks did not violate Ramos's constitutional rights, I do not reach his claim of qualified immunity.

facts, White shot Ramos while he was unarmed and lying on the ground. The use of deadly force to apprehend Ramos would clearly be excessive and violate Ramos's Fourth Amendment rights under those circumstances. See Tennessee v. Garner, 471 U.S. 1, 11 (1985) (use of deadly force objectively unreasonable where "the suspect poses no immediate threat to the officer and no threat to others"). Nor is White entitled to qualified immunity on those facts, since the right in question was clearly established—that is, any reasonable officer in White's position would have known that shooting Ramos would violate the Fourth Amendment. See Reichle v. Howards, 132 S. Ct. 2088, 2093 (2012) (clearly established right exists where every reasonable officer in that position would understand he was violating the right). It is well settled that an officer's use of deadly force violates the Fourth Amendment unless the officer "has probable cause to believe that the suspect poses a threat of serious physical harm." Id.; see also Estate of Bennett, 548 F.3d at 175. On Ramos's version of the facts, when he was shot, he was unarmed and lying on the ground, while Brooks was already at a safe distance and rising to his feet. Under those circumstances, no reasonable officer in White's position could believe that Ramos posed a threat of serious physical harm to anyone.

Of course, White contests Ramos's version of the facts. But that dispute over the material facts only proves that summary judgment is not appropriate. See Fed. R. Civ. P. 56(a).

White also argues that the deposition testimony on which Ramos relies is contradicted by the same witnesses' earlier statements on the night of Ramos's death.

But the deposition testimony is not "so utterly discredited by the record that no reasonable jury could have believed [it]." Scott v. Harris, 550 U.S. 372, 380 (2007). That being so, it is not for the court to determine at this stage of the proceedings which party's account is more credible. White will be free to impeach Ramos's witnesses at trial.

### B. Count II

Count II of the complaint charges the Town of Dartmouth with a practice of failing to properly train and supervise its police force, leading to the violation of Ramos's Fourth Amendment rights. As the defendants point out, Ramos has offered no evidence of such a practice. Ramos has not attempted to defend this count in his opposition to the motion for summary judgment. Therefore, the Town of Dartmouth is entitled to summary judgment on Count II.

### C. Count III

Count III of the complaint asserts liability against Brooks and White under the MCRA. To prevail under that statute, Ramos must prove that "(1) [his] exercise or enjoyment of rights secured by the Constitution or laws of either the United States or of the Commonwealth, (2) have been interfered with, or attempted to be interfered with, and (3) that the interference or attempted interference was by 'threats, intimidation or coercion.'" Swanset Dev. Corp. v. City of Taunton, 668 N.E.2d 333, 338 (Mass. 1996) (quoting Mass. Gen. Laws ch. 12, § 11H). The actor need not "specifically intend to deprive a person of a secured right in order to be liable under the statute." Redgrave v. Boston Symphony Orchestra, 502 N.E.2d 1375, 1378 (Mass. 1987).

Given the disputed facts, neither Brooks nor White is entitled to summary judgment on Ramos's MCRA claim at this point. As discussed above, Ramos has presented evidence from which a reasonable jury might conclude that White violated his Fourth Amendment rights; he therefore satisfies the first and second prongs of the MCRA inquiry. Brooks and White argue that the third prong is not met because Ramos has not shown any threats, intimidation or coercion beyond the direct violation of his Fourth Amendment rights. It is true that a "direct violation of a person's rights does not by itself involve threats, intimidation, or coercion and thus does not implicate the [MCRA]." Longval v. Comm'r of Correction, 535 N.E.2d 588, 593 (Mass. 1989). But here, on Ramos's version of the facts, both officers had covered him at gunpoint and essentially forced him into submission before White shot him. A reasonable jury could find that Brooks and White had coerced Ramos, by force and by threat of force, into a position where White could violate his Fourth Amendment rights. Even if Brooks was unaware that White intended to shoot Ramos, the MCRA does not require a specific intent to violate a person's rights; it is enough that Brooks assisted someone else whose intentional actions violated Ramos's rights. Redgrave, 502 N.E.2d at 1378-79; cf. Davis v. Rennie, 264 F.3d 86, 111-12 (1st Cir. 2001) (upholding jury verdict finding MCRA violation by mental health facility employees who held patient down while another employee violated patient's rights by beating his head).

**D. Count IV**

Count IV asserts an MCRA claim against the Town of Dartmouth for its alleged practice of failing to train its officers. The Massachusetts Supreme Judicial Court has

8

reserved the question of whether the MCRA applies to municipalities. See Am. Lith. Naturalization Club v. Bd. of Health, 844 N.E.2d 231, 243 (Mass. 2006). However, cases from the lower Massachusetts courts, the First Circuit, and this court have established that it does not. See, e.g., Kelley v. LaForce, 288 F.3d 1, 11 n.9 (1st Cir. 2002); Eisenberg v. Wall, 607 F. Supp. 2d 248, 256 n.3 (D. Mass. 2009); Howcroft v. City of Peabody, 747 N.E.2d 729, 744-45 (Mass. App. Ct. 2001). Furthermore, Ramos has presented no evidence of the alleged practice underlying this claim. The Town of Dartmouth is therefore entitled to summary judgment on Count IV.

**IV.   Conclusion**

Defendants' motion for summary judgment is ALLOWED on Counts II and IV and for Brooks on Count I, and DENIED on Count III and for White on Count I.

|  |  |
|---|---|
|   November 2, 2012   |   /s/Rya W. Zobel   |
| DATE | RYA W. ZOBEL<br>UNITED STATES DISTRICT JUDGE |